UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------X
JANET SOLNIN,

                  Plaintiff,                      **MEMORANDUM AND ORDER**
                                              08-CV-2759 (DRH) (AYS)

                 - against -

SUN LIFE AND HEALTH INSURANCE
COMPANY, GENWORTH LIFE AND
HEALTH INSURANCE COMPANY, GE
GROUP LIFE ASSURANCE COMPANY and
PHOENIX LIFE INSURANCE COMPANY,

                    Defendants.
----------------------------------------------------------X
A P P E A R A N C E S :

**Attorneys for Plaintiff:**
TURLEY, REDMOND ROSASCO & ROSASCO, LLP
3075 Veterans Memorial Highway
Suite 200
Ronkonkoma, New York 11779
By:    Troy G. Rosasco, Esq.
        Scott R. Tirrell, Esq.

RIEMER & ASSOCIATES LLC
60 East 42nd Street
Suite 1750
New York, NY 10165
By:    Scott M. Riemer, Esq.

**Attorneys for Defendants:**
WILSON, ELSER, MOSKOWITZ, EDELMEN & DICKER, LLP
601 Walnut Street
Suite 130 East
Philadelphia, PA 19106
By:    Joshua Bachrach, Esq.

**HURLEY, Senior District Judge**

       Plaintiff Janet Solnin ("Solnin" or "plaintiff") brought this action under the Employee

Retirement Income Security Act of 1974, as amended, 29 U.S.C. § 1001, *et seq*. ("ERISA") to

recover long term disability ("LTD") benefits allegedly due from Sun Life and Health Insurance

Company ("Sun Life"), Genworth Life and Health Insurance Company ("Genworth"), GE Group

Life Assurance Company ("GE Group Life"), and Phoenix Life Insurance Company ("Phoenix

Life"), under an employee benefit plan ("the plan").[1]   On April 1, 2014, the "parties stipulate[d]

to a bench trial on a stipulated record, waiving the right to call witnesses, and allowing the Court to

make findings of fact and conclusions of law in accordance with Fed. R. Civ. P. 52(a)."   (Docket

Entry ("DE") 57.)   Having reviewed the record and the parties' submissions, the Court's findings

of fact and conclusions of law are set forth below.

BACKGROUND

A.   Procedural History

On September 24, 2003, plaintiff commenced a separate action ("the prior action") against

defendant challenging defendant's termination of her long-term disability benefits under the plan.

In a decision dated March 23, 2007, the Court found that defendant's decision to terminate benefits

was arbitrary and capricious and not supported by substantial evidence.   As a result, it remanded

the matter back to defendant for further proceedings.   *See Solnin v. GE Group Life Assurance Co.*,

2007 WL 923083 (E.D.N.Y. Mar. 23, 2007).   Plaintiff subsequently filed the present action,

claiming that on remand defendant failed to render a decision on her claim for benefits within the

time frame set forth in 29 C.F.R. 2560.503-1, the applicable regulation accompanying ERISA.

Moreover, plaintiff argued that her claim should be "deemed denied" and that thus, this Court is

---

1 According to defendant, the plan was originally "administered by Phoenix Life until
April 2000, when GE Group Life acquired the group life and health operation of Phoenix Life and
thereafter became the new Administrator.   Defendant's name was later changed to Genworth and
it is now known as Sun Life Financial."   (Defs.' Tr. Brief at 2 (citing Administrative Record
("AR") at 279.)   For ease of reference, hereinafter these various entities will all be referred to as
Sun Life or "defendant."

entitled to review her claim *de novo*.   In an Order dated May 23, 2012, the Court agreed.   *See Solnin v. Sun Life & Health Ins. Co.*, 2012 WL 1888132 (E.D.N.Y. May 23, 2012).

B.   Relevant Plan Provisions

It is undisputed that the relevant portion of the plan at issue states that in order to be classified as "Totally Disabled" a claimant must show the following:

> 1.      During the Elimination Period and following 24 months, you are unable to perform all the material and substantial duties of your regular occupation.
> 2.      After the Elimination Period and the following 24 months, you are unable to perform the duties of Any Occupation.

(Ex. B at 10.)   The plan also defines "Any Occupation" as "[a]ny gainful occupation that you are or become qualified for by education, training or experience.   Your prior level of earnings from your regular occupation will be considered in determining any occupation."   (*Id*. at 5.)

C.   The Parties' Positions

According to plaintiff, "[j]udgment in favor of Solnin is warranted because Solnin proves, by a preponderance of the evidence, that she is totally disabled and unable to perform the duties of 'Any Occupation' within the meaning of the Plan."   (Pl.'s Opening Brief at 1.)   Plaintiff relies largely on the "clinical findings of orthopedic surgeon Thomas Mauri, M.D., who has treated Solnin for over 15 years, and who has consistently opined based on his longitudinal treatment of Solnin, that she is totally disabled and unable to work in her own or any occupation," and the "detailed vocational examination and evaluation of Andrew J. Pasternak, M.A., CRC, who confirmed Solnin is totally disabled from any competitive job."   (*Id*.)   Defendant argues in opposition that plaintiff cannot satisfy her burden.   Defendant relies primarily on video surveillance of the plaintiff conducted on 17 days throughout 2002-2012 as well as the medical

records of several other physicians, including that of the Independent Medical Examiner, Dr.

Moriarty, which they claim demonstrate that plaintiff is not Totally Disabled under the plan.

D.    Burden of Proof

It is undisputed that plaintiff must demonstrate that she is entitled to LTD benefits by a preponderance of the evidence.

FINDINGS OF FACT AND CONCLUSIONS OF LAW

I.    *The Evidence*

A.    Plaintiff's Coverage Under the Plan

1.    Plaintiff was an Assistant Manager for Reliance Federal Savings Bank from September 16, 1996 until February 4, 1999.   During this time she was eligible to participate in and was provided with LTD coverage under the plan, the terms of which were described above.

2.    On November 18, 1998, Solnin injured her back at work when she crawled underneath a desk to fix a computer.   (AR at 1276.)

3.    As a result of this injury, plaintiff stopped working on February 5, 1999.   (*Id.*)

4.    Solnin filed an application for LTD benefits on July 26, 1999.   (*Id.*)

5.    By letter dated August 31, 1999, Sun Life approved Solnin's claim, and paid her the LTD benefits to which she was entitled for the two-year "regular occupation" period from August 4, 1999, through August 4, 2001.   (AR at 1189-90.)

6.    By letter dated May 10, 2002, Sun Life terminated plaintiff's LTD benefits beyond August 4, 2001, "the date the definition of disability changed to Any Occupation," because it claimed that as of that date plaintiff did not meet the plan's definition of disabled.   (AR at 705-07.)

4

B.     <u>Objective Medical Evidence</u>

7.     An MRI of plaintiff's lumbar spine on December 14, 1998 showed a "left posterior foraminal herniation at L5-S1 disc" and "mild degenerative changes at L4-5 disc." (AR at 491-92.) An MRI of plaintiff's thoracic spine on January 29, 1999 also showed a "T7-8 left paracentral disc herniation." (*Id*. at 493.) Additionally, an Electrodiagnostic study performed on February 5, 1999 showed that plaintiff had "Left S1 nerve root pathology," right "L5 nerve root pathology," and right "L5-S1 radiculopathy." (*Id*. at 1181.)

C.     <u>Medical Evidence of Dr. Mauri</u>

8.     Dr. Mauri is an orthopedic surgeon certified by the American Board of Orthopaedic Surgery. (Ex. G at 4.) He is also the Vice Chairman of the Department of Orthopedic Surgery at North Shore University Hospital/Long Island Jewish Medical Center, where he is also the Director of Orthopedic Spine Programs for the Cushing Institute of Neuroscience and Chief of the Division of Spinal Surgery. (*Id*.) He is also a member of various medical societies, including the North American Spine Society and New York State Medical Society. (*Id*. at 5.) He has also given various presentations and lectures throughout his career on topics relating to his profession. (*Id*. at 9-11.)

9.     Dr. Mauri treated plaintiff from April 14, 1999 through July 23, 2012 on a total of 36 occasions. During his first examination of plaintiff on April 14, 1999, he found that plaintiff had "some tenderness in the mid thoracic spine," some patchy loss of sensory function, and difficulty standing on her toes. (AR at 217-18.) Dr. Mauri diagnosed her as having "[t]horacic disc herniation with some spinal cord symptoms without significant spinal cord signs." (*Id*. at 218.) He also recommended that plaintiff continue physical

therapy three times a week and prescribed an anti-inflammatory.   (*Id*.)

10.     On June 1, 1999, Dr. Mauri found that plaintiff was "totally disabled" due to her back pain and recommended she continue with physical therapy.   (*Id*. at 96.)   Dr. Mauri noted that he was not sure plaintiff would ever be able to return to work as a bank manager.   (*Id*.)

11.     On July 12, 1999, Dr. Mauri found that although plaintiff had some weakness of single deep knee bends on the left side, her motor function was 5/5 in all muscle groups and her neurological status was fairly good.   However, he noted that she continued to be totally disabled and stated that it was imperative for her future progress that she continue with physical therapy two to three times a week for at least another three months.   (*Id*. at 94.)

12.     On September 7, 1999, Dr. Mauri found that plaintiff could not walk for more than four or five minutes without having significant left leg pain and weakness.   He also noted that she had pain in the mid-thoracic area, as well as perineal and vaginal numbness, probably due to the thoracic disc herniation.   He noted that she has difficulty with activities of daily living such as shopping and housekeeping and recommended that she continue physical therapy and anti-inflammatory medication.   (*Id*. at 92.)

13.     On December 7, 1999, Dr. Mauri found that plaintiff continued to suffer significant left leg symptoms, left lumbar radicular-type pain, and thoracic spinal cord symptoms.   He noted that she could not go down stairs.   He found that plaintiff was still totally disabled and recommended she continue her physical therapy and anti-inflammatories.   (*Id*. at 90.)

14.     On March 2, 2000, Dr. Mauri wrote:

> Unfortunately, Mrs. Solnin is going to suffer with the residual of her injuries to her thoracic spine for the rest of her life.   I have discussed with her the possibility of having surgery for the thoracic disc herniation but she has chosen to

> continue suffering with the pain rather than take the risks of
> the surgery and certainly this is her option.

(*Id*. at 88.)

15.      On June 1, 2000, Dr. Mauri noted plaintiff's indication that she has difficulty reaching into drawers, bending and twisting and found that she remained totally disabled from any kind of work because of the severity of her injury. (*Id*. at 86.)

16.      On October 2, 2000, Dr. Mauri noted that plaintiff continues to have significant pain in the thoracic area and significant weakness in her left leg. He recommended further physical therapy, but noted she remained totally disabled. (*Id*. at 84.)

17.      On January 16, 2001, Dr. Mauri found "significant neurological deficits" in the left lower extremity and weakness in the left leg directly related to the thoracic disc herniation. (*Id*. at 82.)

18.      On April 10, 2001, Dr. Mauri wrote:

> The patient remains permanently totally disabled at this time
> as she cannot sit or stand for more than thirty minutes at a
> time without having to get up and move around. She also
> has a significant number of bad days where she is home
> unable to function at any capacity. She cannot work at any
> capacity due to this.

(*Id*. at 80.)

19.      On April 22, 2002, Dr. Mauri indicated that plaintiff continued to be totally disabled. He noted that she is able to walk on a treadmill at times, but gets some numbness in her left leg upon doing so. (*Id*. at 74.)

20.      Dr. Mauri's July 22, 2002 notes from plaintiff's examination on that day state that plaintiff continues to be totally disabled and that:

> She has been going to exercise daily to try and maintain the strength
> to control the pain, however, after sitting for twenty to thirty
> minutes she has to get up and move around, otherwise she has
> significant pain in her left leg and her left leg gets numb. This also
> occurs when standing for even a short period of time. She has to
> move around in order to be more comfortable. She finds that she
> has to stretch her leg in order to get rid of the symptoms.

(*Id*. at 73.)

21. On October 28, 2002, plaintiff reported to Dr. Mauri that she had two incidents where her left leg gave way and she fell and required medical attention from a local internist. (*Id*. at 72.)

22. On June 12, 2003, Dr. Mauri reported that plaintiff fell resulting in a left patella fracture and that she remained totally disabled. (*Id*. at 70.)

23. On September 11, 2003, Dr. Mauri indicated that plaintiff could not sit for any period of time that would allow her to do any kind of productive work. (*Id*. at 69.)

24. In addition to continually noting plaintiff's left leg weakness and back pain, Dr. Mauri reported that plaintiff continued to be disabled in his reports of April 12, 2004 (*id*. at 68), July 14, 2004 (*id*. at 66), April 11, 2005 (*id*. at 65), November 2, 2005 (*id*. at 62), September 25, 2006 (*id*. at 63), November 20, 2006 (*id*. at 61), April 23, 2007 (*id*. at 60), August 20, 2007 (*id*. at 59), November 19, 2007 (*id*. at 58), July 2, 2008 (Ex. F at 43), January 12, 2009 (*id*. at 45), December 14, 2009 (*id*. at 52), and July 23, 2012 (*id*. at 57).

25. On November 7, 2007, Dr. Mauri completed a "Physical Medical Source Statement Questionnaire" in which he noted that plaintiff's pain and other symptoms were severe enough to frequently interfere with her attention and concentration. (AR at 221.) He also noted that she could sit or stand continuously for only 1 hour at a time, sit for only two

hours total per day, and stand for only two hours total per day. (*Id*. at 221-22.) Dr. Mauri also explained that plaintiff would need a job that permits shifting from sitting to standing/walking and that she would need to take unscheduled breaks for about 15-20 minutes more than two to three times per day. (*Id*. at 222.) He also indicated that although plaintiff did not require a cane or other assistive device, she could only carry up to ten pounds occasionally, had significant limitations in reaching, and could stoop or crouch for less than five percent of the work day. (*Id*. at 223.) He also noted that plaintiff's condition would likely produce "good days" and "bad days" and that she would likely be absent from work more than four times per month. (*Id*. at 223-24.)

D. Vocational Evidence of Pasternak

26. In December of 2007, Andrew Pasternak, a "Certified Rehabilitation Counselor with almost 40 years of experience involving the assessment, job analysis, and job placement of and for persons with a variety of disabilities," prepared a report discussing plaintiff's vocational capacities and employability. (*Id*. at 141-42.)

27. Pasternak performed standardized tests and work samples "for the purpose of observing the effects of [plaintiff's] disabling conditions on her ability to perform work tasks similar to those in her prior occupations as an Assistant Bank Branch Manager." (*Id*. at 146.) "Scores in the mid-range, 34th percentile to 66th percentile, would deem to be approaching competitive levels, but would not be competitive," while "[s]cores below the 34th percentile would not be in a competitive range at all." (*Id*.) Plaintiff scored below the 34th percentile on all but one of the tests. For example, she scored in the 5th percentile on the Verbal Comprehension test, which measures an individual's vocabulary. (*Id*. at 147.)

28.  Plaintiff also scored in the 15th percentile on the Short Employment Test of Numerical Ability, which measures a person's ability to use whole numbers for basic arithmetic functions.  (*Id*.)

29.  Plaintiff scored in the 5th percentile on the Verbal Reasoning test, which involves the reading of lists of facts and then having the examinee indicate if conclusions based on the facts are either true, false, or uncertain.  (*Id*.)

30.  Plaintiff scored in the 2nd percentile on the Visual Speed and Accuracy test, a test of clerical detail ability, which asks the examinee "to compare lists of numbers to determine if they are the same or different."  (147.)

31.  Plaintiff scored in the 40th percentile on the Office Skills Test of Form Completion, another test of clerical detail ability, which involves the examinee reading simple paragraphs of information and then entering that information in the proper places of a mock form.  (*Id*.)

32.  Plaintiff scored in the 1st percentile on the Manual Dexterity test, which assesses the examinee's ability to use his or her whole hands to assemble a five-piece work sample quickly and correctly.  (*Id*. at 148.)

33.  Plaintiff underwent a weight carrying test in which she was asked to lift and carry a weight of 4.4 pounds in her right hand for a distance of 20 feet.  She performed the task at a rate of two times slower than that of an able-bodied person.  (*Id*.)

34.  Pasternak observed that during the tests, plaintiff was often distracted, required oral reinforcement, and consistently complained of pain in her mid and lower back, left hip, left leg, and left knee.  (*Id*. at 147-48.)

35.  Pasternak reported that "[t]he test battery was internally consistent and reliable, was valid,

and the results accurately reflect[ed] [plaintiff's] vocational capacity for sustained gainful

activity at [the] time. Throughout the evaluation there were neither indications of

malingering nor any attempt to distort her performance or exaggerate symptoms." (*Id*. at

146-47.)

36.    Pasternak concluded:

> In my opinion as a Vocational Expert, Mrs. Solnin is
> functionally incapable of performing the duties of any of her
> former positions as an Assistant Bank Branch Manager on a
> sustained full-time, regular competitive basis. Nor does she
> have the capacity to achieve or sustain a competitive level
> for other jobs in the local or national economy. This
> includes jobs even at the Sedentary level of physical
> demand. Furthermore, she is functionally incapable of
> achieving a substantial income from any possible job.

(*Id*. at 148.)

37.    Pasternak's opinion was based on plaintiff's very impaired performance on tasks requiring

higher-level (executive) functioning, impaired competitive production rate on clerical-type

tasks requiring sedentary physical demands, difficulty concentrating on clerical-type tasks,

the quality of her work being below a competitive level due to poor attention to fine detail,

impaired gross dexterity as well as manipulation, impaired bimanual coordination, reduced

physical stamina, complaints of pain in the mid and lower back, pain in the left hip, pain in

the left leg, left knee, left ankle, all becoming more intense after five minutes and then

progressively distracting during testing. (*Id*.)

E.    <u>Surveillance</u>

38.    In the course of investigating Plaintiff's claim for total disability, Sun Life came across an

article in plaintiff's local newspaper that mentioned the possibility that plaintiff had

traveled intercontinentally in late 2000 or early 2001. (AR at 814-15.) Also during the

investigation, Sun Life attempted to contact Mr. Solnin, whom plaintiff had designated to

act on her behalf in communicating with Sun Life, at his place of employment. In doing

so, it "encountered a telephone voice mail, which sound[ed] like Ms. Solnin leaving a

message on behalf of her husband's company," leading it to believe that plaintiff "might be

providing some sort of employment or other services to her husband's company that might

indicate some functional capacity for on-going employment." (*Id*. at 786.) These

experiences led Sun Life to investigate plaintiff's condition by conducting video

surveillance of her activities. (*Id*.)

39.    Surveillance was conducted on April 15, 17, and 19, 2002. (718-25.) The following is a

summary of the observations:

*April 15, 2002*: At 9:40 a.m., plaintiff watered her lawn for approximately twelve minutes.
About an hour later, she walked across the street, picked up an empty trash can, and carried
it to the side of her neighbor's home and then walked back to her residence dragging her
own trash can, which she brought to the side of her house. She returned to the curb and
carried a second trash can to the side of her house. All of the trash cans were made out of
plastic. At around 3:40 p.m., she drove seven minutes to physical therapy, where she
stayed for approximately 36 minutes until she drove home. At 4:44, she watered the
shrubs in front of her house for approximately 5-6 minutes and then went back inside. At
4:52, she removed a package from the trunk of her car and drove seven minutes to the
supermarket where she stayed for twenty minutes. She exited the supermarket pushing a
grocery cart filled with groceries and a plant, put the bags and plant into her trunk, and
drove home. When she arrived home, she carried the bags into her house and left the plant
on the front step.

*April 17, 2002*: At 8:46 a.m., the plaintiff exited her house, opened the trunk of her car and
moved items around in the trunk, and then watered plants in front of her house. About 8
minutes later, a woman pulled up to the front of the house, walked to the front door, and
after a brief conversation with plaintiff, they both entered the house. At 9:20, the plaintiff
again watered the plants, and about five minutes later a "Dunrite Lawn Sprinkler" van
pulled up to the house. A man exited the van, had a brief conversation with the plaintiff,
and worked on the sprinkler system. At 9:49, the plaintiff went inside. She exited again
a short while later, spoke with the man working on the sprinklers, and then returned inside.

At 10:27, the plaintiff exited the house and drove five minutes to physical therapy. After 45 minutes, she left, drove home, and went inside. At 1:45 p.m., she got in her car and drove eight minutes to a local nursery. After 15 minutes, she exited the location pushing a shopping cart filled with plants and plastic bags, placed them in her trunk, and drove approximately seven minutes to Bloomingdales. After parking in a handicap spot, she removed a bag from her trunk and went inside. She was inside for about 40 minutes after which she returned to her vehicle, placed a paper bag in her trunk, and then drove home and removed the items from her car. From about 5:26 to 5:48 she was observed cleaning the inside of her vehicle while bending over. During this time she also pulled a trash can from the side of the house to the curb and watered the shrubs.

*April 19, 2002*:  At 10:00 a.m., the plaintiff exited her house and drove four minutes to physical therapy. At 11 a.m., she left physical therapy and drove home. At 11:18, she exited her home and walked to a car stopped in front of her home where she talked to the driver for approximately 8 minutes. She then drove 6 minutes to a dry cleaner, went inside, and exited carrying clothing on hangers, which she placed in the rear seat. She drove home and carried the clothing into her house. At 1:36, her husband drove her to have lunch at a restaurant about 20 minutes away. They ate for approximately half an hour and then exited the restaurant and walked to a Banana Republic in the same shopping center as the restaurant, where they stayed for 20 minutes. They then drove home.

40.   Based on this surveillance, on May 10, 2002, Sun Life advised plaintiff that she did not meet the definition of Total Disability. (AR at 705-08.)

41.   Throughout the course of this litigation, additional surveillance was conducted at plaintiff's home on 14 additional days: September 25, 27, 2002; May 15, 17, 18, 19, 2007; August 8, 9, 11, 2008; July 27, August 3, 8, 16, 17, 2012. (*Id*. at 4-6, 621-28, 650-52, Ex. D.) On ten of these days, the plaintiff was not observed entering or exiting her home. On the days that the plaintiff was observed, she mostly performed activities similar to those performed during the April, 2002 surveillance such as driving relatively short distance to run errands, taking in the trash cans, and carrying items to and from her car. Plaintiff was never observed performing activities outside of her home for an extended period of time with the exception of August 3, 2012, when plaintiff was away from her home for approximately 4.5 hours while attending a dentist appointment and shopping.

F.    Other Medical Evidence

1.    **Dr. Entin**

42.    After examining the plaintiff during a neurological consultation on December 3, 1998, Dr.

Erik Entin reported plaintiff's complaints of pins and needles in the lower half of the body

and back pain, but noted that she had no gait difficulty.   He reported that her condition

could be secondary to her diabetes, but that an MRI was necessary for any further

recommendations.   (AR at 1231.)

2.    **Dr. Davis**

43.    Dr. Raphael Davis, Chair of the Department of Neurological Surgery at the University

Medical Center at Stony Brook, whom plaintiff describes as her "consulting physician"

(Pl.'s Proposed Findings of Fact and Conclusions of Law ¶ 29), saw plaintiff on February

24, 1999.   He noted that plaintiff's MRI evidenced "very modest degenerative disc disease

primarily mid-thoracic and lower lumbar."   While, he reported plaintiff's complaints of

significant lower extremity weakness and shakiness, he was unsure of the cause of these

complaints because he did not believe that what he saw on the MRI was of "clinical

significance."   (AR at 1227.)

3.    **Dr. Efron**

44.    Dr. Allen Efron, whom plaintiff saw as a result of an emergency visit (*Id*. at 307),

performed a single neurosurgical evaluation of plaintiff and explained his findings in a

March 1, 1999 report.   He reported that the plaintiff moved fairly easily and did not have

any restrictions in spinal motion.   He also stated that he could not corroborate a thoracic

myelopathy.   (*Id*. at 1284-85.)

### 4. **Dr. Lopez**

45. On May 21, 1999, Dr. Joseph Lopez, an orthopedic surgeon, examined plaintiff in connection with her worker's compensation claim.   Dr. Lopez found that plaintiff was not in acute distress and was able to ambulate well, though there was some tenderness around the thoracic spine.   He concluded that there was a causal relationship between the accident and her cervical, thoracic, and lumbar strains, but that there was no orthopedic disability and that she was fit to return to her previous job and deskwork.  (*Id*. at 357-60.)

### 5. **Dr. Parisi**

46. Dr. Ralph Parisi treated plaintiff on September 30, 1999, June 29, 1999, August 10, 1999, and February 17, 2000.   On those occasions, Dr. Parisi noted plaintiff's mid thoracic spine pain and lower extremity pain, particularly on the left side.   Although he noted that "there is a paucity of objective findings," he observed that the MRI showed an S1 nerve root problem.  (*Id*. at 1050-52.)

### 6. **Dr. Michaels**

47. Dr. Robert Michaels performed an orthopedic examination of plaintiff on April 26, 2000 in connection with plaintiff's workers compensation claim.   According to his records, during the examination, plaintiff had difficulty ambulating and used a cane.   She "had subjectively diminished sensation greater in the left lower extremity than the right."   Dr. Michaels concluded that there was a causal connection between the accident and her diagnosis of thoracic sprain and thoracic disc protrusion, but found that there was "no objective evidence to corroborate this patient's continued claims of disability." According to Dr. Michaels, plaintiff had a mild disability based on subjective complaints

and could return to desk work with no lifting of greater than ten pounds, and no climbing or other strenuous physical activity. (*Id*. at 354-56.)

7. **Dr. Hicks**

48. In April of 2002, Sun Life referred plaintiff's medical records to Dr. Thomas K. Hicks for an opinion on whether plaintiff was totally disabled. (*Id*. at 809.) Hicks opined that plaintiff was "not impaired to the point where it would prevent her from working." (*Id*. at 808.) After review of these records, he found that she was capable of performing a sedentary occupation involving limited walking, no climbing stairs or ladders, no lifting over 5 pounds, and no pushing or pulling. (*Id*.) Dr. Hicks also reviewed surveillance of the plaintiff in May 2002 and found that there were inconsistencies between plaintiff's claimed functional level and her observed physical activities. (*Id*. at 712-13.)

8. **Dr. Mund**

49. On October 31, 2007, after recently undergoing hand surgery for "tenosynovitis of several fingers, plaintiff was seen by rheumatologist, Douglas Mund, M.D. upon referral from her hand surgeon. (Ex. F, at 1.) Dr. Mund noted that plaintiff had no systemic complaints other than in the hands and no significant morning stiffness or other joint involvement. Dr. Mund reported that all lower extremity joints were normal. (*Id*. at 1-2.)

9. **Dr. Maisel**

50. In May of 2010, plaintiff was examined by Dr. Richard Maisel, a cardiology specialist. Dr. Maisel reported that plaintiff exercised regularly on a treadmill at a rate of 3.4 miles per hour. Dr. Maisel noted that plaintiff complained of chest discomfort beginning in 2009 when she was visiting her son in Israel, where he attended medical school. He explained

that plaintiff describes the discomfort as a "sticking pain" in her chest that usually occurs approximately half a mile into her treadmill session. Dr. Maisel noted, however, that plaintiff's cardiac examination and electrocardiogram were unremarkable. (Ex. F. at 3-5.)

10. **Dr. Moriarty**

51. Dr. Robert Moriarty, an orthopedic surgeon, performed an independent medical examination of plaintiff at the request of Sun Life. In a report dated August 27, 2012, Dr. Moriarty noted that plaintiff walked without a limp and did not require an assistive device. He also noted that she sat comfortably during the interview and was able to get on and off the exam table without difficulty. She exhibited a full range of motion in the hips, knees, and ankles and no motor weakness of the lower extremities. Moriarty found that "[a]t best, the [plaintiff] ha[d] evidence of a possible mild partial degree of impairment, for which, . . . [she] could work in a semisedentary-type office-based position with weight handling restrictions to 20 pounds and restrictions on repetitive bending and repetitive lifting." He also found that the plaintiff could work an 8 hour day and "likely [could] engage in more activities than she currently states that she can do." Furthermore, he found that her "reported left lower extremity weakness and the nondermatomal sensory loss . . . is not explainable on an orthopedic basis, nor explainable on the basis of testing provided to date." (Ex. C.)

52. Additionally, Dr. Moriarty viewed the 2012 video surveillance of plaintiff concluding that "there is no visible evidence that the claimant is disabled in [any way] from her activities of daily living" and that she should return to an assistant bank manager position. (Ex. C at 1-5, Addendum to Independent Medical Examination.)

17

53.    Dr. Mauri wrote a rebuttal report in response to Dr. Moriarty's report.   In that report, he reiterated that although left leg weakness is not a typical presentation of thoracic disc herniation, "a minority subset of the population suffering from thoracic disorders exhibit this symptom," and plaintiff "belongs in this minority subset."   He also noted that he recommended plaintiff for surgery, but she elected not to undergo the surgery due to the "attendant risks of such invasive procedures."   He also reiterated that plaintiff was not fit to work an 8 hour day because her symptoms necessitate that she lie down with a heating pad, particularly during a flare up, and that her symptoms are unpredictable.   He also noted that the surveillance footage did not "speak to Ms. Solnin's ability to sit/stand/walk/lift/carry on a <u>consistent</u> basis."   (Ex. G.)

G.    <u>The Loan Application</u>

54.    On a Uniform Loan Application dated March 19, 2005, plaintiff sought a loan of $382,000 from Ameriquest Mortgage.   (Ex. E.)   The application indicates that plaintiff had been employed as a free lance marketer at Marketing Ventures for eight years.   She listed her home phone number as the business phone number for Marketing Ventures and her home address as the address of the company,

55.    According to an internet directory, Cortera, which defendant accessed in 2009, Marketing Ventures employed 5 to 10 employees and had an annual sales of $500,000 to $999,000. (AR at 326.)   The only person identified with the company on this website is the plaintiff.

56.    In an affidavit, plaintiff explains that her husband, Gil, has been the sole owner and operator of Marketing Venures for the last thirteen years.   She states that although, as discussed above, she recorded a voice message for the Marketing Ventures's voice

messaging system at her husband's request, she has never been an owner, officer, or employee of Marketing Ventures or of Brand Ventures, another company that according to New York State Division of Corporations records was run out of the plaintiff's home. (Pl.'s Rebuttal Aff., Ex. I; AR at 325.)

57.     Plaintiff also explains that Ameriquest advised her and her husband to list plaintiff as the applicant on the loan application because she had a better credit score, but that the application was filed jointly.   She also claims that although she completed and signed an Ameriquest application on March 19, 2005, the application contains additional incorrect information that did not appear on the original that she signed.   She claims, for example, that she did not list Marketing Ventures as her employer.   She also claims that the application incorrectly indicates that she received an overtime payment of $7,283.43 and that she had a vested 401k retirement account in the amount of $5,500.00.   She states that while it correctly states that she had a checking/savings account, it incorrectly states the amount in the account as $6,500.00.   Additionally, she claims that the application incorrectly states that she owned $1.4 million in real estate.   She also claims that although the application indicates that an interviewer from California spoke with her by telephone and signed the application on March 11, 2005, she only interacted with an Ameriquest representative physically present at the Syossey branch.   Plaintiff explains that upon realizing that the application contained additional information that she had not authorized, she and her husband commenced a lawsuit against Ameriquest in the Northern District of Illinois in September of 2006.   (Ex. H, Solnin Aff. ¶¶ 10-32)

## II.     *Analysis*

A.    Medical Evidence

58.    At least two doctors explicitly reported that plaintiff's injuries were causally related to the

incident at plaintiff's workplace on November 18, 1998.   (*See* reports of Dr. Lopez and

Dr. Michaels, AR at 354-60.)

59.    Moreover, the reports from plaintiff's treating physician, Dr. Mauri, which consistently

discuss plaintiff's leg and back problems and label plaintiff totally disabled, are evidence

that the incident left her totally disabled pursuant to the plan.   The Court is "free to

evaluate [the treating physician's] opinion in the context of any factors it considered

relevant, such as the length and nature of [the] relationship [with the patient], the level of

the doctor's expertise, and the compatibility of the opinion with the other evidence."

*Connors v. Connecticut Gen. Life Ins.*, 272 F.3d 127, 135-36 (2d Cir. 2001).   To that

extent, the Court finds the medical opinion of Dr. Mauri highly probative.   Dr. Mauri

holds various credentials including that he is a board certified orthopedic surgeon, the Vice

Chair of Orthopedic Surgery and Director of Spine Programs at North Shore hospital.

Additionally, he has treated plaintiff on 36 occasions spanning a lengthy amount of time as

he first saw plaintiff in April of 1999 shortly after her injury and has continued to treat

plaintiff through at least July of 2012.

60.    Moreover, as Dr. Mauri explains in his reports (*see e.g.*, AR at 218), his conclusion that

plaintiff suffers from a thoracic disc herniation is supported by objective medical evidence

contained in the MRI of the lumbar spine on December 14, 1998 showing a "left posterior

foraminal herniation at L5-S1 disc" and "mild degenerative changes at L4-5 disc," (*id*. at

491-92), and an MRI of the thoracic spine on January 29, 1999 showing a "T7-8 left

paracentral disc herniation" (*id*. at 493).

61.     The Court finds the reports of the other doctors to be less persuasive, particularly, Dr.
        Hicks who never examined plaintiff.   As noted by the Court in the prior action, "it cannot
        be said that Dr. Hicks'[s] April 2002 rejection of Dr. Mauri's 2002 reports was based on
        'reliable evidence' when the evidence relied upon consisted of one medical report from
        February 1999 and another from April 2000," i.e., the medical reports from Dr. Davis and
        Dr. Michaels.   *Solnin*, 2007 WL 923083 at *11.

62.     In that Order, the Court also noted that Dr. Hicks had "wholly failed to consider Plaintiff's
        recent complaints of pain."   *Id*.   "It has long been the law of this Circuit that 'the
        subjective element of pain is an important factor to be considered in determining
        disability.' "   *Connors*, 272 F.3d at 136 (quoting *Mimms v. Heckler*, 750 F.2d 180, 185 (2d
        Cir. 1984).   To this end, the Court places a great deal of weight on the plaintiff's assertion
        that she "continue[s] to suffer from unbearable pain in [her] mid-back, weakness in the left
        leg, and [is] susceptible to falls when [her] leg gives out."   (Pl.'s Aff. ¶ 6, Ex. H.)   As is
        discussed further below, plaintiff's statements about her condition have been consistent
        and the Court finds no reason to doubt her credibility with regard to her self-reported
        symptoms.

63.     The Court finds the reports of the other doctors who examined plaintiff at the request of
        Sun Life, like Dr. Moriarty, and those doctors who saw her only one time, in comparison to
        Dr. Mauri's 36 times, even less persuasive.   *See Connors*, 272 F.2d at 135-36 (affording
        less weight to doctors that examined plaintiff only once or were hired by plaintiff's
        insurance company and adversary).   For example, with respect to Dr. Mund's report, as

plaintiff notes, she was referred to Dr. Mund by her hand surgeon following hand surgery because of ongoing hand joint symptoms. While Dr. Mund made general statements about the condition of plaintiff's other joints and lower extremities, he did not treat plaintiff's back and leg conditions and the main focus of his report was on plaintiff's hands. (Ex. F at 1-2.)

64.    The report from Dr. Maisel, cardiologist, discussing plaintiff's trip to Israel to visit her son in medical school and plaintiff's ability to walk on the treadmill at a rate of 3.4 miles per hour is not inconsistent with plaintiff's claimed inability to work. With respect to the Israel trip, defendant does not provide any evidence that plaintiff's behavior on the trip was in any way contrary to her claims regarding her physical limitations. The fact that she simply travelled to Israel, without more circumstances of that trip, is insufficient to discredit plaintiff's disability claim. Moreover, the fact that plaintiff can walk on a treadmill at a rate of 3.4 miles per hour[2] does not conflict with Dr. Mauri's assessment of her inability to sit and stand for extended periods of time. In fact, plaintiff performed this exercise in compliance with Dr. Mauri's recommendation that plaintiff engage in physical therapy and exercise to strengthen her back and legs. Her participation in exercise does not invalidate plaintiff's disability claim.

B.    <u>Vocational Evidence</u>

65.    The Court affords considerable weight to Pasternak's report indicating that plaintiff did not have the capacity to achieve or sustain a competitive level for other jobs in the local or

---

[2] Neither Dr. Maisel's report nor the parties indicate the total distance that plaintiff typically walks during her treadmill sessions. However, Dr. Maisel's report does indicate that plaintiff experiences chest discomfort about a half a mile into her treadmill sessions, which suggests that she regularly walks at least up to that distance.

national economy.   Although as defendant points out, Pasternak relied on the medical

records of Dr. Mauri, which were favorable to the plaintiff, he also relied on plaintiff's

impaired performance during his testing of plaintiff's ability to perform work tasks.

Moreover, Pasternak, with over 40 years of experience in job assessment and analysis of

people with disabilities, found that plaintiff was not purposefully skewing her results or

exaggerating her symptoms.[3]

C.    Surveillance Footage

66.    In its March 23, 2007 opinion in this matter, the Court evaluated the April 2002

surveillance footage explaining:

> Although video surveillance tape may be instructive in comparing
> claimant's behavior with her reported limitations, *Billinger v. Bell
> Atl.*, 240 F. Supp. 2d 274, 285 (S.D.N.Y, 2003), *aff'd*, 124 Fed.
> Appx. 669 (2d Cir. 2005), "the information gleaned is not
> necessarily dispositive on its face and must be considered within the
> context of the particular case." *Glockson v. First Unum Life Ins.
> Co.*, No. 7:04-cv-838, 1877140, 2006 WL at *5 (N.D.N.Y. July 6,
> 2006).   As explained by the Court in *Glockson*:
>
> There are extreme cases where the surveyed activity is so
> inconsistent with a claimant's reported limitations that a simple
> viewing of the surveillance constitutes substantial evidence.   For
> example, in *McGarrah v. Hartford Life Ins. Co.*, 234 F.3d 1026,
> 1029 (8th Cir. 2000), a claimant who was disabled from working as a
> truck driver due to a herniated disc was videotaped moving about
> unimpaired, including unloading furniture.   That is not the case
> here.   Plaintiff's activities were not conclusively outside the range
> of activities of someone incapable of sedentary work.
>
> *Id.*   The same is true in the instant case.   Here, the activities

---

[3] Defendant's claim that two other courts recently rejected Pasternak's opinion is not
accurate.   In both *Wedge v. Shawmut Design & Constr. Group Long Term Disability Ins. Plan*, 23
F. Supp. 3d 320 (S.D.N.Y. 2014) and *Rozek v. New York Blood Center*, 925 F. Supp. 2d 315
(E.D.N.Y. 2013), the court found that the plan administrator's decision to reject Pasternak's report
was not arbitrary and capricious, but did not itself reject the report.

> recorded on the video tapes are not entirely inconsistent with
> Plaintiff's reported limitations as noted in her own statements as
> well as the reports of Dr. Mauri, her treating physician.

2007 WL 923083, at *10.   The Court finds no reason to depart from this reasoning now.

As noted in the same Order, the "generally recognized definition of [sedentary] work" is

work which involves " 'two hours of standing or walking and six hours of sitting in an

eight-hour work day.' " *Connors*, 272 F.3d at 136 n.5.   Nothing recorded on the

surveillance demonstrates that plaintiff is capable of sedentary work.   Although on one

occasion, plaintiff was observed engaging in activities outside of her home for

approximately 4.5 hours, this activity does not establish that plaintiff is, ipso facto, able to

perform sedentary work, which would require plaintiff to be capable of 6 hours of sitting

and 2 hours of standing per day, 5 days a week.

67.   Moreover, although the surveillance footage depicts plaintiff driving and leaving her home

to attend physical therapy, eat, and shop, as well as carrying items, none of which appeared

heavy, to and from her car, as Dr. Mauri notes, it "does not speak to Ms. Solnin's ability to

sit/stand/walk/lift/carry on a <u>consistent</u> basis."   (Ex. G at 3.)   As Dr. Mauri stated, the

surveillance "does not support that she is able to carry out these activities on a consistent

basis over an 8-hour period, 40 hours a week."   (*Id.*)

68.   Defendant argues that the surveillance indicates that plaintiff lied about her condition on

her Supplemental Claim Statement, which she filled out in December of 2007, but the

Court disagrees.   On that form, plaintiff asserts that she is required to use a cane when she

is by herself on bad weather days.   She does not state that she requires the use of a cane on

other occasions.   Therefore, the fact that she was not seen using a cane on the days she was

observed does not necessarily mean that plaintiff was untruthful. Additionally, she describes her typical daily activities as follows:

> Stay home, watch TV, read magazines, take nap in afternoon due to interrupted sleep night before, occasionally meet friends for short lunch, drive locally, go to local gym occasionally to do physical therapy on treadmill, occasionally do light shopping, in summer will move hose and water flowers.

(AR at 180.) Additionally, she describes her typical weekend activities as follows: "Do some shopping with my husband if weather is good. On bad weather days, I must try and stay indoors. Go to diner with husband." (*Id.*) These descriptions accurately reflect her activities on the surveillance footage.

69.   Pasternak's description of plaintiff's self-reported symptoms are also consistent with her statements on the Supplemental Claim Statement and with what is depicted on the surveillance footage. According to Pasternak, she reported that she typically spends her days watching t.v., reading magazines, going to local stores for errands at times, occasionally visiting local friends, taking afternoon naps, and watering the flowers. (*Id.* at 142.)

D.   The Loan Application

70.   Defendant argues that the Loan Application completed by Plaintiff is proof that not only is she capable of working, but she actually has been doing so. Although the application appears to indicate that plaintiff was working at Marketing Ventures in January of 2005, plaintiff testified in an affidavit that she was never employed by Marketing Ventures and that Ameriquest altered her loan application without her authorization. Plaintiff also claims that based on Ameriquest's fraudulent alteration of her application, she commenced

a lawsuit against Ameriquest in September of 2006, alleging that Ameriquest violated the Truth in Lending Act, 15 U.S.C. § 1601. However, Sun Life points out that the complaint in that action does not mention anything about Ameriquest's alteration of the loan application without plaintiff's authorization. The complaint, however, only contains causes of action pursuant to the Truth in Lending Act and state law asserting that Ameriquest made certain "defective disclosures" regarding the loan. (AR at 391-99.) Since facts relating to the alleged alteration of the loan application are not relevant to those claims, it is not apparent and defendant has not pointed out, any reason why it would have been logical or necessary for plaintiff to have included those facts in the complaint.

71. While the voice message recorded by plaintiff and the statements contained in the application indicating that plaintiff was an employee of Market Ventures in 2005 give the Court pause, defendant has not offered any evidence that plaintiff was performing any actual work for this company or any other company. Moreover, when viewing the totality of the evidence, including the voluminous evidence from plaintiff's treating physician Dr. Mauri, the vocational evidence of Pasternak, objective evidence of her condition, and subjective evidence of her pain, plaintiff has proven, albeit not overwhelmingly, but by a preponderance of the evidence that she meets the definition of "totally disabled" pursuant to the plan.

<u>CONCLUSION</u>

Plaintiff has proven by a preponderance of the evidence that she is entitled to disability benefits. Plaintiff is to prepare a proposed judgment and to file such judgment within thirty (30) days of this Order.

The above constitutes the Court's Findings of Fact and Conclusions of Law.

SO ORDERED.

DATED: October 28, 2015
      Central Islip, New York


_____/s/_____
DENIS R. HURLEY, U.S.D.J.